## Smith, et al. v. Commonwealth.

(Decided May 11, 1928.)

### Appeal from Bell Circuit Court.

1. Homicide.—Verdict finding defendants, claiming they shot in self-defense, guilty of willful shooting and murder held flagrantly against evidence.

2. Homicide.—In prosecution for murder, instruction in effect that jury could not acquit either of defendants on ground of self-defense unless he believed that his codefendant likewise acted. in his legitimate self-defense held erroneous since each defendant had right to act on appearances as they were presented to him, regardless of what his codefendant believed or did in matter.

3. Homicide—Each defendant had right to kill in self-defense upon appearances as they were presented .to him, regardless of what his codefendant believed or did in matter.

JAS. M. GILBERT, MORRIS & JONES and N. R. PATTERSON for appellants.

J. W. CAMMACK, Attorney General, and M. B. HOLIFIELD, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Thomas—Reversing.

The appellants and defendants below, Botner Smith and Frank Bowman, together with Dan Smith, Gus Smith, and Zin Girtman, were jointly indicted by the grand jury of Bell county in which they were accused of willfully shooting and murdering Dr. R. L. Lattimore at about 2 o'clock p. m., on December 25th, 1926, and which occurred in the residence of the deceased located in a mining village in that county. Upon a separate trial of the two appellants they were convicted and punished by confinement in the penitentiary for their respective lives. On this appeal from the judgment of conviction, the chief and possibly the only meritorious grounds relied on for its reversal are (1) that the verdict is flagrantly against the evidence and (2) erroneous instructions.

Botner Smith was the constable in the magisterial district in which decedent resided and Frank Bowman was a duly and regularly appointed and acting deputy sheriff of the county, while one Walter Snow was the elected and qualified and acting justice of the peace of the magisterial district. About 12 o'clock on the fatal day both appellants were in the village wherein the justice of the peace maintained his office, and Smith was there for the purpose of executing some civil process that had been given him by the justice of the peace in a civil case pending in his court. The village in which decedent resided was a mile and a quarter from the office of the justice of the peace. Shortly after the noon hour the son of the deceased (who was 13 years old) appeared before the justice of the peace and swore out two warrants of arrest for his father, in one of which he was accused of drunken and disorderly conduct, and in the other of which he was accused of maliciously striking and wounding his wife with a pistol, and those warrants were given to defendant, Botner Smith, for execution. The cause for the son procuring the two warrants was that his father became considerably intoxicated on that Christmas morning, and when his wife refused to give him or allow him to drink more intoxicants he became exceedingly angry and struck her once or twice on the side of the head with a pistol and wounded her so that she bled profusely. Upon receiving the warrants, Smith requested Bowman to accompany and assist him in their

execution, and they went to the village of decedent's residence.

The news of decedent's assault upon his wife had spread over the village, and the fact that he would soon be arrested seems also to have been as well known. Somewhere along the route appellants came in contact with Gus Smith and Girtman, two of their codefendants in the indictment, and those two followed appellants to decedent's residence, but neither of them, nor was the other codefendant, Dan Smith, summoned by either of the appellants or requested to assist them in making the arrest, though each of them followed the two appellants as they went upon the porch of decedent's house, and likewise entered the door when the latter opened it. The five defendants in the indictment and Mrs. Lattimore and her 13 year old son were the only eyewitnesses to the homicide, which occurred in the front room of decedent's residence and which was used by him as an office.

Decedent admitted appellants into his office after they had gotten on the porch in front of it, and Botner Smith informed him of having the warrants for his arrest, and he requested that they be read and when the officer read to him the one charging him with drunkenness he remarked: "I am not going." About that time decedent's wife appeared in the door between the office and an adjoining room and, according to the testimony, she then said: "Botner take him on and put him in jail where he belongs, because he has already about killed me and he will kill some of the family." Whereupon decedent waved his hand at her and said: "You go back in the kitchen where you belong." He then turned to Smith and asked: "What did you do with that warrant?" The latter told him: "Put it in my pocket." Deceased then said: "Read it again." Reaching into his pocket the officer then drew out the warrant accusing deceased of maliciously assaulting his wife with a pistol, and began to read it to him. While he was doing so, deceased drew a pistol and shot once or twice at appellant Bowman, who was standing near by, and by that time the latter drew his pistol and commenced firing at deceased until his weapon was empty, and he then went through the door separating the office from the adjoining room where Mrs. Lattimore was, but in the meantime appellant Smith, in an effort to escape, had gotten to or through that door. Deceased then turned on and advanced to-

wards him, after Bowman had succeeded in getting away, with his pistol drawn, whereupon he (Smith) fired two shots at him, after which he fell on the floor and his pistol was also on the floor near his hand.

The above account of the difficulty was given by appellant, Smith, and it was corroborated in all of its essential particulars by the other four defendants, and Mrs. Lattimore did not deny in her testimony the part of it as to how the shooting began or how it continued, since she stated that she could not see from her position in the adjoining room through the door into the one where the shooting was going on until after it was over; but she did state that the first shot was not so loud as the ones that immediately followed it, and that it sounded like it was from a pistol of smaller caliber than the others, and which corroborated defendants' testimony, because decedent's pistol was a .32-caliber with automatic action, while Bowman's was a .38-caliber and Smith's a .45-caliber. Witnesses located close by and on the outside of the house corroborated that testimony of Mrs. Lattimore as to the first shot producing the smaller sound, and to that extent also corroborated the testimony of all the defendants as to who fired the first shot. It was also shown that when decedent drew his pistol and pointed it at Bowman the latter said: "Oh, Doc, don't do that," and the only response that the request received was a shot at Bowman by the decedent. Neither Smith nor Bowman received any wound, but the latter's clothing in two places was penetrated by a bullet. The witnesses in their testimony go into greater detail as to what transpired at the immediate time, but the above is the substance of their testimony, and to the extent that they said that the decedent fired the first shot they were corroborated as we have shown by Mrs. Lattimore, who was in the adjoining room, and by a number of witnesses on the outside of but near to the building.

Mrs. Lattimore and her son stated in their testimony that the deceased requested Smith, after he had read the first warrant, to permit him to eat his dinner, after which he would submit to the arrest and "fix it up," which request Smith refused, with an oath, but that testimony was denied by defendants. Mrs. Lattimore also stated that some time during the forenoon of that day she hid the pistol of her husband, and that in some way unknown to her he succeeded in obtaining hers, which was

of a smaller caliber than his, and that he had her pistol
on or about his person during the shooting, and that it
was found close to his body after he fell upon the floor;
and she furthermore testified that while the parley was
going on about the warrants she told defendant, Botner
Smith, to "take him (the decedent) on and not argue
with him."

Carson Lattimore, the 13 year old son of the de-
ceased, preceded the officers into decedent's house by a
few minutes, and when they entered he was with his
mother in the room adjoining the front one where the
shooting occurred. He saw them coming and told his
mother their purpose in doing so. In giving an account
of what then happened, he thus testified:

> "Q. Tell all that was said and done. A. I don't
> know whether they read it (the warrant) or not, and
> then Pappy said: 'Wait until I eat dinner,' and they
> said, 'No, we have got orders from the court to take
> you right now,' and Pappy said, 'Just wait until I
> eat dinner and I will go and settle up with you.'
> Q. What did they say then? A. They said, 'No, by
> God, you are going right now.' Q. Who said that?
> A. Botner Smith. Q. Then what happened? A. Frank
> Bowman jerked a pistol and shot him, then Botner
> Smith shot him. Q. What was your father doing
> when Frank Bowman shot him that first shot? A.
> Just barely got the word out of his mouth—Botner
> Smith just barely got the word out of his mouth,
> 'Yes, by God, you are going now,' until Frank Bow-
> man jerked his pistol and shot him."

He then stated that he did not see his father with a
pistol or fire a shot, but that he saw his mother's pistol
on the floor close to his father's hand after the latter
fell. He furthermore stated, as did also other witnesses,
that about eight bullet holes were made in the walls and
windows of the room in which the shooting was done, and
all of which, of course, were discovered after the battle
was over. On cross-examination, he testified, as did also
his mother, that while or immediately following the read-
ing of the first warrant his mother tried to enter the room
where his father was, and that he (witness) got in front
of her and scuffled with her throughout the shooting to

keep her from doing so and in which he succeeded, and, in describing the difficulty he had in doing so, he was asked if his mother did not give him "a right smart tussle," to which he answered: "She sure did." He was thus placed between his mother and the shooting and with his back to it. She testified that, notwithstanding her face was toward the shooting, she was so located that she could not see it, but the son testified that, notwithstanding his difficult task of keeping his mother from entering the room, and notwithstanding his back was turned toward it, he found time to turn his head away from his mother and in the opposite direction so that he could see *all* that transpired throughout the shooting, which continued, all told, according to the testimony, but a few seconds.

It will thus be seen that in all of the positive testimony as to the transaction given by any witness who was present, the only incriminating facts of any consequence were testified to by young Lattimore, and that his admissions on cross-examination largely weakened his testimony in chief, and in which he displayed great bias and recklessness when viewed in the light of all the other testimony and when measured by the well-known rules of human conduct. But for his testimony in chief there appears practically nothing to support the verdict of conviction, since without it a clear case of self-defense on the part of both of the convicted defendants was established.

The commonwealth introduced some witnesses to prove prior supposed incriminating statements made by Botner Smith with reference to deceased, but when analyzed they amount to no more than statements by him concerning the dangerous character of the deceased and of his quarrelsome disposition (which was tesified to by many witnesses and not denied), from which Smith was alleged to have expressed the opinion that he might eventually be killed while resisting arrest. The character of Smith was also attacked by a few witnesses of the commonwealth, but he sustained it by many more, and no trait of the character of Bowman was attempted to be assailed. The impeaching witnesses as to Smith's character, as well as those who testified to the alleged statements or threats above referred to (and which Smith denied), were themselves impeached as to their credibility and they produced no witnesses to sustain it.

The indictment contained the charge of a conspiracy between all of the named defendants therein and some testimony was introduced in an effort to establish it; particularly as to some alleged threats by the defendant, Dan Smith, who was not on trial. The court at the conclusion of the testimony properly held that there was not sufficient evidence of the conspiracy to submit it to the jury and it was not done, and at the same time he excluded all of the testimony that had been heard upon that issue. But some of it, and especially that concerning the alleged threats by Dan Smith, remained with the jury for as much as or more than three days before it was excluded, and we cannot but conclude that its introduction and its remaining with the jury so long had more or less a poisonous effect on the minds of the jurors. But whether we would reverse the judgment for that error alone we do not now determine.

No one can read this record without reaching the conclusion that at the time in the neighborhood where this killing occurred, and prior thereto, there was a great deal of law violation and that those who favored its enforcement were in the minority. These convicted defendants appear to have belonged to the minority party, and many, if not all, of the witnesses who testified against them had experienced the consequences of their efforts at law enforcement. Under such circumstances, it would not be a difficult task for a vigorous prosecutor to procure a conviction based on the testimony of young Lattimore alone, incredible as it is, and that conclusion is strengthened by the incompetent testimony with reference to the conspiracy that we have referred to and which was permitted to remain throughout the taking of all the evidence. We are therefore constrained to the conclusion that the verdict is flagrantly against the evidence and this ground is sustained.

The chief criticism under ground (2) is directed to instruction No. 3 submitting the right of self-defense. It is so worded as to require each defendant to believe, in the exercise of his reasonable discretion, the existence of the facts creating the necessary danger to excuse the killing on the ground of self-defense, and *also* to believe that his codefendant was likewise so convinced. In other words, as the instruction was framed the jury could not acquit either of the defendants on the ground of self-defense, unless he believed that his codefendant likewise

acted in his legitimate self-defense. It requires no supporting authority to show the error in that instruction. Each defendant had the right to act upon the appearances as they were presented to him, regardless of what his codefendant believed or did in the matter, and upon another trial the court will redraft the instruction so as to conform to these views. See Lewis v. Com., 224 Ky. 502, 5 S. W. (2d). It will also exclude all testimony bearing upon the conspiracy charge, unless it should be sufficiently reinforced by additional testimony on that issue to that offered on this trial. Likewise no testimony should be admitted concerning statements made *after* the shooting by any of the defendants not on trial, unless the one on trial was present and heard the proved statements when made, or unless the testimony was for the exclusive purpose of contradiction, in which case the proper admonition should be given. The court did not follow such directions, especially to the witnesses Bailey and Coleman, who testified in rebuttal.

For the reasons stated, the judgment is reversed with directions to set it aside and grant the new trial and for proceedings consistent herewith.